Clayton **ARPAN**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15809.**

United States Court of Appeals
Eighth Circuit.

Sept. 24, 1958.

Rehearing Denied Dec. 1, 1958.

———◆———

Robert H. Allen, Phoenix, Ariz. (Flynn & Allen, Phoenix, Ariz., on the brief), for appellant.

Clinton G. Richards, U. S. Atty., Sioux Falls, S. D. (Lyle E. Cheever, Asst. U. S. Atty., Sioux Falls, S. D., on the brief), for appellee.

Before GARDNER, Chief Judge, JOHNSEN, Circuit Judge, and DUNCAN, District Judge.

JOHNSEN, Circuit Judge.

Appellant, a 29-year old Indian, was charged with having murdered his wife, in the second degree, on the Cheyenne Indian Reservation in South Dakota. He was found guilty by a jury and was sentenced by the court to 15 years imprisonment. Federal jurisdiction rests on 18 U.S.C.A. §§ 1153 and 1111.

The wife was shot in the brain, by a bullet from a .22 caliber pistol belonging to appellant—the fatality having occurred in the bedroom of their home, about 2 o'clock a. m., on December 13, 1956. Appellant admitted that he was in the house at the time but professed to be without knowledge or impression of what had happened or of how the gun had been discharged. He had returned home a little over a half hour preceding, from a beer and vodka spree with some companions, which had lasted from shortly after 6 o'clock in the evening until around 1 o'clock a. m.

Initially, he and his wife had gone over to his parents' home, about 6 o'clock p. m., for an evening visit. Within a short time, two cronies of his appeared and wanted him to drive them to a nearby town to get some liquor. The wife went along on the trip, and during its course the men began to partake of a bottle of vodka, which one of them had. After purchasing a supply of vodka and beer at the town tavern, they drove back to appellant's home on the Reservation, to watch a 9 o'clock boxing telecast. The men continued their vodka imbibing, both on the return trip and through the telecast.

Meanwhile, another crony made his appearance and, when the boxing program was over the four companions set out in appellant's car. Their first stop was at the house of one of the cronies, where they extended their drinking operations until their host came to the end of his capacity and had to be put to bed. The survivors thereupon excursed to town again, keeping up their thirst-slaking efforts, both on the road and at the tavern. When the tavern closed its doors at midnight, they started back toward the Reservation, with a resumption of their bottle-passing ritual in the car.

Ere they got entirely home, the car ran out of gasoline. Another automobilist who came along—a friend of theirs—pushed them the rest of the way and into appellant's yard, alongside the house. By that time, a second member of the group had succumbed and was accordingly left slumbering in the car. Appellant and the other stalwart, however, were

not yet ready to call it quits, and with a recruiting of their Samaritan friend and his automobile they betook themselves back to the house of the crony who had been the first to pass out, where some vodka, which they had left, presented a matter of unfinished business. Finally, when there was nothing more to consume, the friend brought them back to appellant's home, which appellant and his companion entered, with the friend driving off.

According to the testimony of the companion, appellant's wife was still up when they came in, and cordial words were exchanged amongst them. The companion departed about 1:30 a. m., at which time the wife had withdrawn to the bedroom and appellant was standing in the doorway thereof. It was about a half hour later that the shooting occurred.

Appellant's story as to the fatality was that his mind was completely blank on what he had done or whom he had been with, from the time that they had put the first crony to bed and left his house, until his stupified senses became partially aroused by the sound of a pistol shot. When the realization of hearing a shot came to him, it was his impression that he was either sitting, or standing, "or something", in the front room of the home, just off the bedroom. He remembered finding himself thereafter, as his consciousness increased, standing in the bedroom and seeing his wife lying prostrate on the floor, by the side of the bed. He said that he picked her up, put her on the bed, held her, covered her, and then ran for his mother and father, who lived nearby. He declared in his testimony that he did not believe that he had shot his wife, but that it might be possible in his stuporous state that he had done so. His position, both to the investigating officers and on the witness stand, was, "I just don't know".

The first contention urged for reversal is that the court erred in denying appellant's motion for acquittal and his subsequent motion to set aside the jury's verdict, because the evidence was not sufficient, in necessary element of corpus delicti, to establish that the wife "came to (her) death by violence and under such circumstances as to exclude the supposition of a death by accident or suicide and warranting the conclusion that such death was inflicted by a human agent; leaving the question who that guilty agent is to after consideration". The language thus quoted by appellant is from the opinion of Chief Justice Shaw, in Commonwealth v. Webster, Mass., Bemis Rep. 473, adopted by Professor Wigmore for text purposes, in VII Wigmore on Evidence, 3rd ed., § 2072, at p. 402.

There is no dispute as to the fact that the wife's death was due to the discharge of a gun and the penetration of her brain thereby, so that necessarily, in physical aspect and by legal concept, she died from violent means, or in other words came to her death by violence. The only thing further, therefore, that the evidence was required to do, in corpus delicti essential, was to exclude the supposition of accident or suicide and to warrant the conclusion that the death was inflicted by other human agency capable in the situation of being criminal.

■ For purpose of appellant's motion to be acquitted on corpus delicti ground as a matter of law, the sufficiency of the evidence to exclude accident or suicide and to warrant a conclusion of criminal causation would turn, in the court's legal testing thereof, not on whether the probative basis for such exclusion and warrant amounted to legal absoluteness, but upon whether it possessed such substantiality, on over-all perspective, as to be capable rationally of allowing such a jury persuasion and finding. Whether the accused represented that human agency, and, if so, whether what he did, though probatively capable of being found to be criminal, was, in application to him on the circumstances involved, such in fact, are questions extending beyond the matter of corpus delicti and going to the specificness or merits of personal guilt.

In the situation presented, the bullet had channeled into the wife's brain through a hole in the left side of her neck, located approximately two inches below and one inch behind the lower aspect of the left ear. The course of the missile had been upward and to the right, at an angle of approximately 45 degrees in each direction. The wife admittedly was right-handed. It also was shown that she had a 50 per cent rotative limitation, with accompanying muscular atrophy and weakness, existing in her left forearm, from a fracture and injury occasioned by an automobile accident of 2½ years before.

By common knowledge or on simple demonstration, these facts would be capable of rationally convincing that a firing of the gun by the wife personally, in a manner necessary to produce the mortal wound, would be of such practical impossibility or artificial difficulty as not to make compelling a supposition of suicide shooting, by protective doubt of law. And corroboratively, the circumstance that the wife had, immediately preceding, in her preparation for retiring, placed her clothing in orderly array and natural position for convenient redressing, on a chair by the bed, would be capable of pointing to the non-existence of suicide distractedness on her part in the drama involved. Again, the lack of proximity of her fingers or hand to the gun, as well as the presence of appellant's fur cap under her arm, could further add to the probative incongruity of suicide as against other human agency.

Equally were the circumstances probatively sufficient to exclude the supposition of death from accident on the part of the wife, as a doubt of law. The location of the wound and the presence of a burnt or blackened area surrounding it, as shown by the evidence, would on accident hypothesis, mean a supposition that the wife had been engaged in recreational, experimental, or other personal attempt, at 2 o'clock in the morning, to bring the barrel of the gun around to a position just below her left ear—or

that she had been reclining with it under or immediately adjacent to her head—and that it had, in one or the other of these situations, undergone a fortuitous discharge. The facts and circumstances set out seem to us to contain such elements of probativeness rationally opposing this possibility, as not to make legally compelling a supposition of accidental death and as to entitle the question of non-accidental causation to be left to the jury.

Appellant makes the further contention, however, that even if the proof was thus adequate against suicide or accident supposition for corpus delicti purposes, still it was not sufficient to permit of a finding of personal guilt of homicide on the part of appellant beyond a reasonable doubt.

On the question of personal guilt, renewal is made of the argument that the evidence is open to "the real possibility" that the wife may have committed suicide or may have shot herself accidentally. What we have said on corpus delicti aspect, as to the contrary probativeness contained in the facts and circumstances being sufficient to not require the supposition legally that the death had so occurred, is equally applicable here.

But beyond this, the Government's evidence, as admitted by the court, to tie appellant personally to the shooting, contained other substantial elements (assuming their admissibility) capable of weighing adjunctively against the possibility of suicide or accident being involved. Thus, testimony of a witness was received that, while appellant was sitting with his mother in the front room of the home, after law-enforcement officers had been called, the witness heard the mother "berating him about his drinking, that it wouldn't have happened if he hadn't been drinking, at which time he answered her not to blame anyone else, it was his fault that he did it, and not to blame anyone else". Also, testimony was allowed to be received from another witness, on the basis of implied or adoptive admission by appellant being involved, that the witness had

asked appellant's father, in the room where appellant was seated with his mother, what appellant had said when he came over to the parents' home after the wife's death, and the father had replied that appellant had said "I killed Jeanette"—with appellant not making any denial or other challenge thereto at the time of the father's statement.

Appellant, however, makes the additional argument, on the question of legal doubt as to personal guilt, that the evidence does not sufficiently exclude the possibility of the shooting having been done by one Fielder, the crony who had been left slumbering in appellant's car. It appeared that Fielder had in some manner, by the time of appellant's and his companion's return to the house, made his way from the car to the davenport in the front room of the house. According to the testimony of the companion, Fielder was sprawled on the davenport in drunken sleep. The companion took off Fielder's shoes and stretched him out on the davenport, while appellant got a blanket and covered him, with the two of them engaging in humorous quips about his condition.

Fielder still lay in such position and slumbering state, when he was sought to be aroused by those who had come to the house after the fatality. Coffee was employed to help sober him up for questioning. He said he was unaware of anything having happened to the wife. The evidence was without indication of motive, capacity or opportunity for him to have done the killing. In appellant's assertion of having been aroused by the sound of the shot, he made no claim that Fielder had come out of the bedroom after the shot, or that he had seen or heard any movement, such as Fielder would have had to make to get back to the davenport, cover himself up, and resume his position, following appellant's hearing of the explosion. As a matter of fact, appellant testified that Fielder was a "buddy" of his, cordially liked by both himself and his wife, and that they had permitted Fielder the privilege of

thus sleeping on the davenport on several previous similar occasions.

These facts would not in our opinion raise such a doubt of law as to whether Fielder may have been the wife's killer, as to require the court to direct a verdict of acquittal in appellant's favor.

Beyond the things which have been set out as a basis for the jury to find appellant guilty, there were other probative elements which the jury could also properly take into account. Thus, on the testimony given by appellant's companion, the jury was not required to accept as true appellant's story as to his having been in an amnesic state from the time that they had put the first crony to bed. According to the companion, appellant, while loud-mouthed in his talk, was still wholly intelligible and rational in his speech and in apparent control of his faculties generally, when they returned to the house and when the companion departed at 1:30 a. m. Other testimony showed that, when appellant engaged in such heavy drinking, he sometimes became ugly in his disposition, and that he had on several occasions slapped his wife. And the wife's parents testified that he had once threatened her life, claiming that she was unwilling to become pregnant. She was with child, however, at the time of her death.

■ We have not attempted to set out all of the evidence in the record capable of weighing on the question of appellant's guilt. Enough probative substance has been indicated, we think, to demonstrate that such a basis of rational probability as to appellant's guilt existed as to make any question of doubt a matter dependent on factual choice and not on legal command.

The next contention made for reversal is that the court erred in refusing to strike, as an implied or adoptive admission of appellant, the testimony of the witness, referred to above, that appellant's father had told the witness in the front room, where appellant was sitting, that appellant had said to the father,

"I killed Jeanette", and that appellant had made no comment as to the father's statement.

■ We declared in Egan v. United States, 8 Cir., 137 F.2d 369, 380–381, quoting from 20 Am.Jur., Evidence, § 570, p. 483, and Sparf v. United States, 156 U.S. 51, 56, 15 S.Ct. 273, 39 L.Ed. 343, that "The general rule is that 'when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth' * * * if made 'under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth'."

■ Ordinarily, it is for the jury to decide, in the light of all the surrounding facts and circumstances, whether the accused actually heard and understood the criminative statement. 20 Am.Jur., Evidence, § 571, p. 485. But whether the circumstances of the statement and its making were such as promptingly to call for a reply by the accused in the situation is a preliminary question for the court. Pulver v. Union Inv. Co., 8 Cir., 279 F. 699, 705; Friedman v. Forest City, 239 Iowa 112, 30 N.W.2d 752, 763.

In practice, the Government has generally been made to satisfy the court that all the elements necessary to give such a statement capacity as an implied or adoptive admission have a probative basis, rather than imposing upon the accused the burden of demonstrating the impropriety of the evidence just because there may be room prima facie to regard the statement as having been made in his presence and hearing. Cf. IV Wigmore on Evidence, 3rd ed., § 1071, at p. 74. This presumably is because of the ban which has traditionally been applied to hearsay evidence in general; and in a criminal prosecution it is perhaps more immediately because of the caution which has judicially been found necessary in respect to any purported, loose, confessional evidence.

Here, the Government undertook to make short shrift of the matter of foundation, by question-beggingly asking the witness to state what inquiry he had made of appellant's father *in appellant's presence* and what the father had said in reply. The witness stated that he inquired of the father what had occurred when appellant came over to the parents' home and that the father answered that appellant had said, "I killed Jeanette". Government counsel then again sought to allay the question of foundational doubt by leadingly and conclusionarily repeating, "That was right in the defendant's presence there?".

This, as related to the immediately preceding testimony of the witness, caused it to appear that the conversation with the father was part of a general and common interrogation of the various members of the family. The witness had just testified that he had seated himself with appellant and his mother and first asked questions of appellant, who stated "that he remembered picking up his wife and placing her on the bed, but he did not recollect anything else that happened in the room at that time". The witness went on in his testimony: "I then questioned (the mother) in (appellant's) presence. I then questioned (the father) in the presence of the defendant and his mother". The implication of this repeated, glossing, and calculated expression as to "presence" was that the witness had conducted all of his questioning from his seated position with appellant, and in community discourse.

But when the opportunity came to counsel for appellant to probe the situation on cross-examination, it developed that the witness's questioning of the father had not been done while he was seated with appellant. He admitted that, after talking with appellant and the mother, he got up and "I moved somewhere else in the room to talk to Mr.

Arpan." Thus, the incident had not in fact involved a common questioning or conversation, and, from the action of the witness (who was the county coroner) in not undertaking to address the father from his seated position with appellant, but going to another part of the room, it would seem that the discourse with the father was designed to be separate and personal, and not one in which appellant was to have relationship or part.

Whether the evidence was sufficient as a basis for the jury to find that appellant could have heard the conversation, it is unnecessary to consider, but a few incidents relevant to that question may passingly be observed. The record shows that appellant and his mother were seated in one corner of the room. It does not indicate where in the room the conversation with the father occurred. A plat of the house generally, appearing in the record, shows that the front room was approximately 16 feet by 16 feet in size. It could perhaps be presumed that conversation in normal tones would be capable ordinarily of reaching to everyone in the room, although if the conversation with the father occurred in a diagonal corner, the distance could have been approximately 23 feet. Again, the witness admitted that there might have been other people present around the room—he was not sure. Nor was there anything to indicate that no other distraction was involved to appellant's attention or to a hearing by him of all the conversation occurring in the room. In fact, when the witness was asked whether he would say that appellant could overhear his conversation with the father, he replied, "I wasn't taking any particular note of that, sir", and "I don't know".

Certain it is that at least there was no thought that appellant was to listen or that he should have any relation to the conversation. Actually, the implication would seem to be that the opposite was in fact intended. Further, it may be doubtful whether the circumstances and setting were of such normality otherwise as even to entitle the Government to have it presumed, without any evidence thereon, that regular conversational tones, and not subdued voices, had been used in the discoursive exchange. The witness had purposely or necessarily withdrawn from his proximity to appellant, in order to converse separately with the father. And, too, in relation to whatever conversation was engaged in in the room, there could be a natural implication of hushing from the hovering presence of death, since the body had not yet been removed from the house.

These are matters to which consideration, as does not appear to have been done, is entitled to be given on the new trial, which we are for other reasons directing. Doubtless the Government can and will lay a better foundation, than the naked generality in which it engaged, as a basis for fair legal likelihood that appellant could have heard the father's statement. The question therefore is one which we leave wholly open to the trial court, without limitation or intimation from the observations in which we have passingly engaged.

The question, however, which gives us direct concern, because of its substantive aspect, is whether the circumstances and situation, on the development made thereof, could legally be held to be such as should responsibly have prompted an intrusion or reply on the part of appellant in respect to the coroner's and the father's conversation.

Usually, situations of implied or adoptive admissions in criminal cases have involved some tie on the part of the accused to the setting or the events of the making of the statement, so that he would naturally be prompted to engage in denial or reply. In patent and extreme example, a man walking on the street and passing two strangers carrying on a private conversation about him could hardly legally be regarded as having a responsibility to stop them and make denial of some incriminating statement asserted against him, in order to prevent it from subsequently being treated as an adoptive admission by him.

Here, as has been noted, on what the record contains, the coroner manifestly was undertaking to hold a personal or private conversation with the father, with an attempted disregarding of appellant and with apparent intent that appellant should have no participating relation thereto. Again, from the admissions made by the witness on cross-examination, in the conversation which he precedingly had with appellant, appellant was sitting with his mother, depressed or withdrawn into himself, in a "state of shock", on the far side of the room, as well as being to a degree still under the influence of liquor—"I would say that he was tapering off from a pretty good drinking bout". And he seemed childlike and relyingly to have put himself into his mother's hands, by remaining seated with her and turning hesitatingly to her in what he said and did.

■ We should have difficulty persuading ourselves that these circumstances, in their normal implication, and without further development, on sound judicial evaluation, presented such a situation of naturally expectable responsiveness to anything which might fortuitously have drifted to appellant's hearing, of the conversation between the coroner and his father, as to entitle his failure to be prompted to interjection or denial to be fairly regarded as an adoptive assent or admission by him. It is to be remembered, as previously pointed out, that this question constituted one of finality for the court on the merits and was not one which the court could assess on a prima facie basis and then pass on to the jury for ultimate resolution.

On what has been said, it seems to us that appellant was entitled to have had his motion to strike the alleged adoptive admission sustained, unless the Government desired thereafter to make proof of some countervailing implications. Doubtless, the Government can and will on a retrial engage in fuller demonstration than its conclusionary swath that appellant's "presence" had been involved and that a ritualistic repeating of that naked word by its foundational witness would be sufficient to give rise to an adoptive admission or confession of guilt.

■ There is, however, another reason also why we think appellant is as a matter of fairness entitled to a new trial. The Government not only got before the jury the statement of appellant's father as to his guilt, but it also tried and succeeded in getting admitted collaterally an alleged statement on the part of appellant's mother that "I think Clayton (appellant) has shot Jeanette". A jury would perhaps not be likely to be bothered too much about the question of an accused's guilt, where it was made to appear to them that both his father and his mother had indicated such a belief. Thus, the inherent prejudice from the admitting of the mother's statement that "I think Clayton has shot Jeanette" would seem to be apparent, even though the statement was purportedly received for impeachment purposes only.

The mother's alleged statement was capable also of having another prejudicial effect. It could serve to give direction and meaning in the jury's mind to the testimony of the witness previously referred to, that he had heard the mother "berating (appellant) about his drinking, that it wouldn't have happened if he hadn't been drinking, at which time he answered her not to blame anyone else, it was his fault that he did it, and not to blame anyone else." Without the evidence as to the mother's extraneous statement of her belief, the jury might have regarded the conversation between the mother and appellant about his drinking, and appellant's statement "not to blame anyone else, it was his fault that he did it", as having relation merely to his drinking and not to whether he had killed his wife. With the mother's other statement before it, it would impress that the ambiguity in the conversation would probably be given prompt relation to the question of appellant's responsibility for his wife's death and not to the question of responsibility for appellant's drinking.

The statement of the mother that "I think Clayton has shot Jeanette" was admittedly not made in appellant's presence. On cross-examination of the mother at the trial, the Government, over objection that the matter was beyond the scope of her direct examination, was permitted to show that the mother, after going back with appellant to his home, thereafter went to the house of the Superintendent of the Agency to inform him of the wife's death. Government counsel then sought to bring out what she had said. She replied: "I called his name through the window and told him something terrible had happened at Clayton's and for him to come down there". The Government thereupon, over objection, was further permitted to ask, "Didn't you say at that time, 'I think Clayton has shot Jeanette'?". The witness answered, "No, sir".

The Government thereafter called the Superintendent of the Agency in rebuttal and put to him this question: "I'll ask you if when (the mother) came to your house that night she didn't make a statement substantially as follows: 'I think Clayton has shot Jeanette'?". Over objection that the answer would be incompetent and immaterial, and that the question did not contain a proper matter of impeachment, since it was in a collateral field, as well as having relation merely to testimony elicited wholly outside the scope of the mother's direct examination, the witness was allowed to answer, "That is essentially the statement".

Clearly, it was immaterial in the legal establishing of appellant's guilt what the mother's thoughts or opinion in the matter may have been. And equally, even if it were assumed arguendo that the mother's opinion could have materiality, it was incompetent as against appellant to prove such opinion by hearsay expression thereof to the Superintendent. The court therefore as a matter of immateriality should not have allowed the Government to interrogate the mother about the conversation which occurred between her and the Superintendent. But beyond this, and without regard to the legal impropriety of the field of inquiry generally, when the mother was asked whether she had not said "I think Clayton has shot Jeanette" and made answer "No, sir", the way was in any event not open to the Government to engage in impeachment of her answer.

■■ It is the general rule that self-contradiction of a witness by prior statements may be shown only on a matter material to the substantive issues of the trial. Cf. Gordon v. United States, 344 U.S. 414, 420, 73 S.Ct. 369, 373, 97 L.Ed. 447. The answers of a witness as to irrelevant matters developed on cross-examination are not entitled to be contradicted. Sutherland v. United States, 4 Cir., 92 F.2d 305, 308. Where a witness is asked concerning a collateral matter on cross-examination, the party cross-examining is bound by the answer made. Foster v. United States, 8 Cir., 145 F.2d 873, 875; United States v. Klass, 3 Cir., 166 F.2d 373, 376.

■ It is true that a trial court may in some circumstances, to a limited extent, allow cross-examination on matters collateral to the issues of the case, where this appears to be capable in the situation of exposing hidden interest, motive or prejudice on the part of a witness as to the case or toward one of the parties; and the court may also at times for this special purpose guardedly receive some evidence in contradiction of the witness's testimony. See United States v. Lawinski, 7 Cir., 195 F.2d 1, 7. But such collateral cross-examination or any receiving of evidence in contradiction may not be permitted to the point of incompetently crossing into or casting shadows of prejudice upon the issues of the trial. Nor should what conventionally constitutes impeachment of a witness's answer to a specific question, which is collateral, be doubtfully tolerated on a purported interest-motive-or-prejudice demonstration purpose.

■ We are unable to see how the Government's attempt here to get before

the jury the fact that the mother had said "I think Clayton has shot Jeanette" could be claimed legally to demonstrate hidden interest, bias or prejudice on the part of the mother. Conventionally, the Superintendent's rebuttal testimony constituted simply an impeachment of what the mother had answered to the irrelevant and incompetent question as to the conversation occurring between her and the Superintendent. But practicably, even if the inquiry and rebuttal testimony could possibly be said to go to the demonstration of interest, motive or prejudice, we think, as discussed above, that a getting of the fact before the jury, that the mother had been of the opinion that appellant was guilty, was a crossing into the issue of guilt and that it might cast shadows of prejudice upon the jury's resolution of that question, so that there was no right to grant it collateral admission and the receiving thereof was substantial error.

In incidental relation to the new trial being granted, it may concludingly be observed that no instruction seems to have been either requested or given that the jury could not at all use the father's statement to the coroner for convicting appellant, unless it found that appellant had actually heard and understood the statement. The jury was left free to make absolute or plenary use of the father's statement to the coroner in convicting, regardless of whether it in fact represented an adoptive admission.

The things pointed out would have been capable on the trial involved of perhaps constituting the turning point between a verdict of manslaughter or of second-degree murder.

Reversed and remanded for a new trial.

### On Petition for Rehearing.

The Government seeks reconsideration of our holding that the trial court erred in allowing the Superintendent of the Indian Agency to testify that appellant's mother had said to him, "I think Clayton (appellant) has shot Jeanette (his wife)".

This testimony was admitted in purported rebuttal and impeachment of a denial, made by the mother on cross-examination, that she had voiced such a belief.

Our opinion recognized that "It is true that a trial court may in some circumstances, to a limited extent, allow cross-examination on matters collateral to the issues of the case, where this appears to be capable in the situation of exposing hidden interest, motive or prejudice on the part of a witness as to the case or toward one of the parties; and the court may also at times for this special purpose guardedly receive some evidence in contradiction of the witness's testimony". But, as we cautioned, "such collateral cross-examination or any receiving of evidence in contradiction may not be permitted to the point of incompetently crossing into or casting shadows of prejudice upon the issues of the trial".

We regarded the testimony of the Agency Superintendent as to the mother's expression of belief in appellant's guilt as being irrelevant and incompetent in the circumstances of the particular situation, and so being subject to the general exclusionary rule as to such evidence, and as not coming within the exception limitedly allowed in respect to irrelevant and incompetent evidence where it may serve to expose hidden interest, motive or bias on the part of some witness.

Opinions or expressions of witnesses as to an accused's guilt are of course irrelevant and incompetent as considerations for conviction, and in this sense the question whether they were or were not in fact made necessarily is collateral to the issues of the trial. In addition, such opinions or expressions, more than other forms of collateral inquiry or testimonial contradiction allowed for impeachment purposes, can have a subtle and sensitive influence on the ultimate problem confronting the jury.

Collateral evidence should always receive careful scrutiny in a criminal trial, even though it can prima facie be brought within the impeachment exception to the general exclusionary rule,

if it is of a character that is capable in the particular situation of casting a substantial shadow of prejudice on the jury's resolution of guilt and so is likely in ordinary human reaction to become a substantive factor on the result.

Here, as our opinion set out, the Government had succeeded in getting before the jury an indication on the part of both appellant's father and his mother of a belief in their son's guilt. In the closeness of the family tie which it was manifest from the record existed among them, we were unable to escape the feeling that this evidence probably had had a substantive effect on the verdict which the jury returned. As our opinion stated, "A jury would perhaps not be likely to be bothered too much about the question of an accused's guilt, where it was made to appear to them that both his father and his mother had indicated such a belief". Or, in the more classical expression of Mr. Justice Cardozo, taken from his opinion in Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196, "The reverberating clang of these accusatory words would drown all weaker sounds".

The Government's evidence, without the testimony as to the father's and mother's statements, which we held had been improperly received, was still sufficient to go to the jury and to support a verdict of guilt against appellant on the charge made. But, as we observed generally in respect to the situation, "The things pointed out would have been capable on the trial involved of perhaps constituting the turning point between a verdict of manslaughter or of second-degree murder".

It was because of the controlling considerations referred to that we did not deem it necessary to discuss in the opinion whether the mother's expression of purported belief as to the son's guilt, if made, might otherwise have been capable of coming within the exception, allowing collateral inquiry to be made or collateral evidence in contradiction to be received, for impeachment purposes. From its petition for rehearing, the Government apparently feels that we have refused by our holding to give recognition to any such exception with respect to expressions by a witness of an accused's guilt. We did not intend our opinion to have any such absoluteness.

█ There exists, of course, in varying decisional measure, a recognition, for impeachment purposes, of allowing collateral inquiry and of receiving evidence in contradiction, in respect to a witness's expression of opinion on the accused's guilt. In soundness, however, no such expression of opinion or belief is at all entitled to consideration for admission, unless it is capable on its circumstances of first meeting this general test: "Is there within the broad statement of opinion on the general question *some implied assertion of fact* inconsistent with the other assertion made on the stand?" III Wigmore on Evidence, 3rd ed., § 1041.

█ Thus, necessarily, impeachment may not be attempted or permitted, through proof of an expression of belief on the part of a witness as to the accused's guilt, if the fact on which it is desired to impeach is not one which existed, and of which the witness had knowledge, at the time of his expression. Furthermore, that knowledge must be such, in its character and circumstance, as reasonably to entitle the expression of belief to be regarded as representing an embodiment of the fact. In other words, the situation of the witness in respect to the expression of opinion made must have been such that "belief and knowledge of the facts were synonymous". Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633, 642.

This is as far as the Ewing case goes, on which the Government relied in its original brief, and which it again cites in its petition for rehearing. The opinion of Judge Rutledge (later Mr. Justice Rutledge) expressly stated: "Our present ruling is limited to the facts of this case, and similar situations, where the circumstances are such that the declaration takes on the character of a statement of fact or of facts in a nutshell, rather

than merely that of the witness' opinion or conclusion drawn from facts of which he does not have knowledge or has only such partial knowledge that the element of opinion outweighs the factual effect of the statement." 135 F.2d at page 643.

In the Ewing case, where a witness's expression of belief in the accused's guilt was allowed to be used to impeach her testimony, the witness admittedly had been present in the apartment during the whole of the period when the criminal attack there involved was claimed to have taken place; she had testified on the stand that the defendant was not in the apartment at that time and could not have been there without her knowledge; and she had further positively stated that it would have been impossible for the attack and the subsequent incidents testified to by the prosecuting witness to have occurred without her knowing of them. Id. at page 642.

Here, the alleged expression of belief sought to be established against the mother in no way came within the situation existing in the Ewing case. The only matters testified to by the mother, on which impeachment would in any manner have been competent, were things which had occurred subsequent to the alleged expression of belief and so could not at all have been an implicit element of that expression.

It is true that the Government had tried to prove that, prior to the mother's expression, appellant had told his parents, "I killed Jeanette". But, as our opinion held, the manner and basis of this attempt (adoptive admission on the part of appellant) were in the situation incompetent, so that the record was without any legal proof that such fact had existed and could have had inherent embodiment in the mother's alleged expression of opinion. Thus, as we have stated, there was no evidence of any pre-existing fact, which could at all have afforded a foundation for any interrogation of the mother as to her alleged expression of opinion or for a receiving of the Superintendent of the Agency's testimony with respect thereto, in purported impeachment of the substantive elements of her testimony.

Even, however, if competent proof had existed of appellant's alleged statement, we would still, as our opinion indicated, have regarded a demonstration to the jury in the present situation of both the father's and the mother's belief in appellant's guilt as being so likely to affect the jury's determination of that question or its resolution of the degree of the crime involved that the expression of the mother's opinion should not be allowed to be received for the legally subordinate purpose of impeachment.

■ The allowing of interrogation or the receiving of evidence in contradiction, for impeachment purposes, on matters otherwise irrelevant or incompetent in respect to the issues of the case, is, as we have emphasized, an exception to the general exclusionary principle existing as to such evidence. Exceptions in the field of evidence ordinarily have a tendency to spread out from the subordinacy of an exception into the primacy of a rule of admission. In the case of an expression of opinion by a witness as to the accused's guilt, however, the exception is one of such sensitiveness that it cannot soundly be allowed to undergo such a general transformation.

■ Any attempt to use such an expression for impeachment purposes must at all times be narrowly and discriminatingly eyed. And if, in the circumstances of the expression or the relationship of the witness, there exists any natural likelihood that the jury's mind will in the particular situation be obliquely influenced on the question of the accused's guilt or the degree of his offense, interrogation or proof as to the fact of the expression should not at all be allowed to be made.

This represented our evaluation and persuasion as to the elements of the present situation.

The petition for rehearing is denied.