**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Emslie Leander MOORE, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Floyd MOORE, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Pieter Cornelis PANNEKOEK, Defendant-Appellant.**

**Nos. 74–2835, 74–2150, 74–2268.**

United States Court of Appeals, Ninth Circuit.

June 19, 1975.

Rehearing Denied Aug. 25, 1975.

Certiorari Denied Jan. 12, 1976. See 96 S.Ct. 775.

George W. Hunt (argued), San Diego, Cal., for Emslie Leander Moore.

William A. Bower, Asst. U. S. Atty, (argued), Harry D. Steward, U. S. Atty., William A. Bower, Asst. U. S. Atty., San Diego, Cal., on the brief, for appellee.

Leif F. Tessem (argued), San Diego, Cal., for Floyd Moore.

Joseph W. Ruff (argued), San Diego, Cal., for Pieter Cornelis Pannekoek.

## OPINION

Before CHAMBERS, Circuit Judge, RICH,* Judge, United States Court of Customs and Patent Appeals, and ELY, Circuit Judge.

ELY, Circuit Judge:

Each of the three appellants was indicted, along with alleged co-conspirators Charles Heckler and Frank Rezabek, for one count of conspiracy to steal, conceal, and sell United States Government property, in violation of 18 U.S.C. §§ 371 and 641. Appellant Emslie Leander Moore (hereinafter Lee Moore) was indicted on an additional count, charging the substantive offense of concealing stolen Government property, a violation of 18 U.S.C. § 641.

Heckler's case was severed from the others, and he was subsequently called as a witness for the prosecution. In a jury trial, appellants Floyd Moore and Pieter Pannekoek were convicted on the conspiracy count. The same jury failed to reach a verdict as to Frank Rezabek, and his case was scheduled for retrial. Appellant Lee Moore, who was physically unable to undergo the jury trial with his co-defendants, later waived his right to a trial by jury and proceeded to trial before the district judge. The Government submitted its case against Lee Moore on the transcript of the earlier jury trial, and the judge found Lee Moore guilty on both of the counts charged against him.[1]

Lee Moore was ordered imprisoned for five years on each of his two convictions, with the sentences to run concurrently, and fined in the total amount of $10,000. Floyd Moore was sentenced to imprisonment for two years, with all but six months suspended. Pannekoek was sentenced to imprisonment for two years and ordered to pay a $5,000 fine.

The facts of the cases against the appellants center around a scheme to steal new Government-owned hand tools from a self-service Naval supply facility, known as the "Serv-Mart," located at the North Island Naval Base, San Diego, California, and to sell those tools at a Los Angeles marketplace for wholesale tool dealers, known as the "Paramount Swap Meet." The conspiracy began approximately in 1971 when Heckler, the Serv-Mart's assistant manager, agreed to allow Lee Moore, at that time a Navy enlisted man, to make unauthorized exchanges of merchandise that Lee Moore had acquired elsewhere for new hand tools from the Serv-Mart. After these exchanges had continued for approximately four months, Lee Moore, with Heckler's assistance, began to remove tools from the Serv-Mart without providing anything in exchange. In consideration for his co-operation, Heckler at all times received a percentage of the proceeds from the sales of the stolen or exchanged Serv-Mart tools. According to the Government's theory, appellants Floyd Moore and Pannekoek and co-defendant Rezabek participated in the theft scheme by receiving the stolen tools from Lee Moore, selling them at the Swap Meet, and returning at least a portion of the proceeds to Lee Moore.[2]

After the conspiracy was discovered in 1973, Naval supply officials inventoried the North Island Serv-Mart and discovered that the facility had suffered inventory losses of approximately $400,000 between February, 1972 and March, 1973.

## I. *Lee Moore's Appeal*

Lee Moore's first three contentions on this appeal concern an affidavit filed by

* Honorable Giles S. Rich, Associate Judge, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

1. The three appeals herein considered were consolidated by Orders of this court.

2. The proof indicated that in the first months of the conspiracy, Pannekoek sold the stolen goods at the Swap Meet but that in the later months, he was replaced by Floyd Moore and Rezabek.

FBI Agent Reginato in support of applications for warrants to search Lee Moore's house and automobile. Acting on the basis of the affidavit, a magistrate issued the warrants, and FBI agents, executing the warrants, seized numerous new, Government hand tools that later were introduced into evidence against the appellants.

A substantial portion of the Reginato affidavit consists of recited facts assertedly reported to various FBI agents by a single, unnamed informer. Lee Moore first argues that the district judge erred in refusing his two motions for an order requiring the Government to reveal the informer's identity.

■ The Government sought to withhold the informer's identity because the informer had expressed fear for his safety should his identity become known. Lee Moore argued, on the other hand, that if the identity of the informer were revealed, and if the informer were the individual Moore thought him to be, the defendants would then be able to make an initial showing that there were substantial falsehoods in the Reginato affidavit. Such a showing would have entitled the defendants to an evidentiary hearing on the facts asserted in the affidavit. *United States v. Harris,* 501 F.2d 1, 5–6 (9th Cir. 1974); *United States v. Damitz,* 495 F.2d 50 (9th Cir. 1974); *see United States v. Bolton,* 458 F.2d 377, 378 n. 6 (9th Cir. 1972).

Specifically, Lee Moore calls into question a portion of the Reginato affidavit which states that the informer reported to the FBI that on February 23 or 24, 1973, the informer observed numerous Government hand tools in Lee Moore's house and garage. Lee Moore's attorney filed his own affidavit with the court, in which he stated that his client believed the Government's informer to be one Wachhold, who had visited the Lee Moore residence on the specified dates, that he had interviewed Wachhold, and that Wachhold had said that he had not reported to the FBI that he had seen Government tools in the Moore residence. According to the attorney's affi-

davit, Wachhold also stated that he had not told the FBI that he feared for his safety if Lee Moore and the other alleged co-conspirators were to learn that he was the FBI's informer.

■ Initially, Lee Moore's argument presents the question whether the Supreme Court's holding in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), would require disclosure of an informer's identity if such disclosure would enable an accused to make a substantial showing of material falsehoods in an affidavit submitted in support of an application for a search warrant. We think it unnecessary to decide this question, however, since we hold that the trial judge correctly found, after conducting an *in camera* inquiry, that knowledge of the informer's identity would not enable Lee Moore to establish that there were substantial falsehoods in the Reginato affidavit.

Acting on the basis of the attorney's affidavit, the district judge conducted *in camera* interviews with certain FBI agents and the Government's true informer, during which he learned the informer's identity and inquired, insofar as he believed necessary, into the Government's reasons for secrecy and the bases for certain portions of the Reginato affidavit. In recent cases, our court has approved such *in camera* interviews for the purposes of determining whether law enforcement officers have justifiably trusted the conclusions drawn by an informer whose reliability has otherwise been established, *United States v. Anderson,* 509 F.2d 724, 727–30 (9th Cir. 1974), *cert. denied,* 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975); *United States v. Tutweiler,* 505 F.2d 758 (9th Cir. 1974), and whether knowledge of an informer's identity would be helpful to an accused's defense on the merits, *United States v. Rawlinson,* 487 F.2d 5 (9th Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1579, 39 L.Ed.2d 881 (1974). The *in camera* procedure provides an equally-acceptable accommodation of the competing interests of the Government and the accused in the situation presented here,

wherein the question is whether a law enforcement officer has lied. Through disclosure of the informer's identity to the trial judge, and such subsequent inquiries by the judge as may be necessary, the Government can be protected from any significant, unnecessary impairment of necessary secrecy, yet the defendant can be saved from what could be serious police misconduct.[3] Having examined the sealed transcript of the *in camera* proceedings, we believe that the trial judge's conclusion, i. e., that knowledge of the informer's identity would not aid Moore in making the required showing, was correct.

■ Lee Moore next contends that there was ample other evidence of substantial misrepresentations in the Reginato affidavit to support his demand for an evidentiary hearing on the facts therein presented. Moore points out here, as he did in the trial court, that paragraph one of the affidavit states that the informer had provided reliable information to the FBI on *five* occasions in the past, while paragraph nine recites that the informer had provided reliable information on only *two* past occasions. Additionally, Lee Moore argues that certain language in the affidavit could lead a careful reader to the conclusion that a vehicle described in certain of the factual allegations in the affidavit was not the same vehicle for which a search warrant was sought. In our view, neither of these apparent inconsistencies in the language of the affidavit approaches the "substantial showing of falsehood" that is required. *United States v. Harris,* 501 F.2d 1, 5–6 (9th Cir. 1974).

Acting carefully to protect the defendant's rights, the district judge inquired into both of these alleged discrepancies during the *in camera* interviews discussed above. We emphasize that these *in camera* inquiries were not intended as, nor were they, substitutes for the evi-

dentiary hearing to which the appellant would have been entitled had he made the threshold substantial showing of falsehood. Rather, the district judge conducted the *in camera* inquiries to assist him in determining whether the appellant had made the necessary initial showing. After the inquiries, the judge found that the required showing had not been made, and our study of the sealed transcripts of the *in camera* proceedings convinces us that the judge's conclusion was proper.

■ For his final point concerning the contested search and seizure, Lee Moore argues that the Reginato affidavit was, on its face, inadequate to establish probable cause and consequently, that the trial judge erred in denying the appellant's motions to suppress the seized tools as evidence. We disagree. The appellant's argument, which focuses on alleged inconsistencies in the language of the affidavit and supposed insufficient bases for certain of the facts therein reported, urges, in effect, that we read Agent Reginato's affidavit with an extremely critical eye. The law requires no such approach. Affidavits submitted by law enforcement officers to support applications for search warrants must be read in a common sense and realistic manner. *See, e. g., United States v. Harris,* 403 U.S. 573, 577–80, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Read in that light, the Reginato affidavit establishes that the informer had given reliable information in the past and that his reports to FBI agents were based either on his personal observations or his personal purchases from the conspirators. These showings satisfy the twin tests of *Aguilar v. Texas,* 378 U.S. 108, 114–15, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Moreover, the affidavit also sets forth a number of facts gathered independently by FBI agents that tend to corroborate the informer's statements. For example, the informer reported that he had seen

**3.** See Grano, *A Dilemma for Defense Counsel: Spinelli-Harris Search Warrants and the Possibility of Police Perjury,* 1971 U.Ill.L.F. 405, 445–47; *cf.* Fed.R.Crim.P. 16(e); ABA Standards, Discovery and Procedure Before Trial §§ 2.6(b), 4.6 (1970); *Proposed* Fed.R.Ev. 510(c)(3) (not enacted by Congress).

**1074**

certain of the conspirators selling Government tools at the Swap Meet and had, himself, purchased such tools from them. The affidavit recites that two FBI agents also purchased tools, marked with a unique Government symbol, from two of the alleged conspirators at the Swap Meet. *See Spinelli v. United States,* 393 U.S. 410, 415–16, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

■ To complete the Government's showing, Reginato's affidavit relates information provided to the FBI by a named representative of a tool manufacturer concerning the unique identifying markings placed on Government tools and specific data reported by a named officer of the United States Navy concerning the inventory losses at the Serv-Mart. Even though these reports were hearsay, the magistrate was legally entitled to consider them in determining whether the affidavit established probable cause. *See, e. g., Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Finally the affidavit details results of the FBI's physical surveillance of various of the alleged conspirators and Lee Moore's van-type truck, for which one of the search warrants was sought, at the Serv-Mart, Lee Moore's residence, and the Swap Meet. Viewing the affidavit as a whole, we find that it provides adequate support for the magistrate's conclusion that probable cause existed to believe that hand tools, stolen from the Government, were being concealed in Lee Moore's house and garage.

■ As his next issue, Lee Moore contends that the evidence adduced at trial failed to prove the single conspiracy charged in the indictment but instead revealed that actually there were three small conspiracies participated in by (1) Lee Moore and Heckler, (2) Lee Moore and Pannekoek, and (3) Lee and Floyd Moore and Rezabek. The appellant argues that this alleged variance between the indictment and the proof requires reversal of his conspiracy conviction. Even if we were to find, however, that the appellant's interpretation of the evidence is correct, a question that we do not reach, he would be wholly unable to show, as he must, that he was prejudiced by the variance. *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States v. Baxter,* 492 F.2d 150, 160 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). Under the appellant's own view of the evidence, he was a central figure in *each* of the alleged three smaller conspiracies. Consequently, unlike the situation presented in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), upon which the appellant relies, he was not subjected to the danger that he might be convicted on the basis of evidence that related only to a conspiracy of which he was not a part.

Both of Lee Moore's two remaining contentions, which are that the Government failed to prove that the stolen tools were Government property and that there was a material variance between the prosecution's offer of proof and the testimony ultimately given by one of the Government's witnesses, are, in our view, without substantial merit.

Lee Moore's convictions, on both counts, are affirmed.

## II. *Floyd Moore's Appeal*

Floyd Moore's principal contention on appeal concerns the admission into evidence against him, as an admission by silence or acquiescence, of a statement reportedly made by co-defendant Rezabek. Government witness Hellerud, a tool dealer who frequented the Paramount Swap Meet testified about the statement, first as he was questioned about a conversation between him and Rezabek at the Swap Meet. The prosecutor asked: "Now, what did Rezabek tell you about the tools?" Hellerud answered: "Well, he said if he had to go legitimate, that he would have to get out of business." A few minutes later, during the cross-examination of Hellerud by Rezabek's attorney, Hellerud again was asked about Rezabek's statement.

"Q And did this [statement] come up as part of a conversation that you had directly with Frank Rezabek or did this come up as a part of a conversation which was had by the group?

A No, it came up as the direct conversation.

Q As you were talking to Frank Rezabek, and he was talking to you?

A To me, yes.

Q And did he have the tools in front of him at the time?

A That is correct.

Q And he mentioned illegitimate tools. Is that correct? That's the word he used?

A I wouldn't say that 'illegitimate,' He said if he had to go legitimate, he would have to quit. 'We would have to quit,' he says.

Q 'We would have to quit'?

A And that's——

Q Did anybody else say anything in response to that in the crowd?

A No."

On three different occasions, Hellerud was asked to be specific about Floyd Moore's whereabouts when Rezabek made the incriminating statement, but Hellerud's testimony remained vague. His two clearest answers were in response to questions from the prosecutor and the trial judge.

"Q [By the prosecutor] When you talked with Frank Rezabek about the tools, was anyone else present?

A Oh, there was always people around. I couldn't pinpoint any particular person.

Q Do you remember if anybody accompanied Frank to the swap meets that sold tools with him?

A Well, [Floyd] Moore sold tools with him.

Q Was he there when you had these conversations with Frank?

A He was in the group.

\*  \*  \*  \*  \*  \*

THE COURT: \* \* \* Sir, now, you are being asked about a specific conversation with Mr. Rezabek. Having that conversation in mind, do you recall specifically who was present on that occasion?

THE WITNESS: No, I couldn't. I know him and Moore and two or three other guys that was all in a group; but I couldn't pinpoint who it was."

Originally the trial judge instructed the jury that Hellerud's testimony could be considered only against Rezabek. At the close of the evidence, however, the judge, over Floyd Moore's objection, reversed his previous ruling and instructed the jurors that they could consider the statement also as evidence against Floyd Moore if they first found that Moore heard the statement, that he could be expected to comment on the statement and had an opportunity to do so, and that he manifested his belief, by words or conduct, in the statement's truth.

■ The general rule concerning admissions by silence or acquiescence is well established. When an accusatory statement is made in the defendant's presence and hearing, and he understands and has an opportunity to deny it, the statement and his failure to deny are admissible against him. Fed.R.Ev. 801(d)(2)(B); *Osborne v. United States,* 371 F.2d 913, 921 (9th Cir. 1967); *Sandez v. United States,* 239 F.2d 239, 246 (9th Cir. 1956), *reh. denied,* 245 F.2d 712 (9th Cir. 1957); *see generally* C. McCormick, Evidence § 270 (2d ed. 1972).

■ Before admitting the proffered admission by silence, the trial judge must determine, as a preliminary question, whether the statement was such that under the circumstances an innocent defendant would normally be induced to respond. *Arpan v. United States,* 260 F.2d 649, 655–57 (8th Cir. 1958); *cf. Orser v. United States,* 362 F.2d 580, 584–85 (5th Cir. 1966). Ordinarily, the jury then decides, with proper instructions from the court, whether in the light of all the surrounding facts, the defendant actually heard, understood, and acquiesced in the statement. *Orser v. United States, supra* at 584; *Arpan v.*

*United States, supra* at 655; *see generally* 31A C.J.S. Evidence § 296 (1964).

██ But even as to the questions ultimately left to the jury, i. e., whether the defendant heard, understood, and acquiesced in the statement, the trial judge must exercise a preliminary measure of control. Specifically, he should not submit the proffered admission by silence to the jury unless he first finds that sufficient foundational facts have been introduced for the jury reasonably to infer that the defendant did hear and understand the statement. *See Arpan v. United States, supra* at 655–57 (evidence insufficient to support a finding that the defendant heard the accusatory statement); *Sandez v. United States,* 239 F.2d 239, 246 (9th Cir. 1965), *reh. denied,* 245 F.2d 712 (9th Cir. 1957) (holding, as one ground for error, that there had been uncontradicted testimony that the accused understood little or no English and the accusatory statement had been spoken in English); *see generally* C. McCormick, Evidence § 270 at 652 (2d ed. 1972).

██ Likewise, the judge should not admit the statement unless he determines that the evidence would sustain a finding by the jury that the defendant did accede to the accusatory statement. *See United States v. Ragano,* 476 F.2d 410 (5th Cir. 1973) (no admission by silence when defendant's total response adds up to clear-cut denial); *Skiskowski v. United States,* 81 U.S.App.D.C. 274, 158 F.2d 177, 182 (D.C.Cir.), *cert. denied,* 330 U.S. 822, 67 S.Ct. 769, 91 L.Ed. 1273, *reh. denied,* 331 U.S. 870, 67 S.Ct. 1749, 91 L.Ed. 1872 (1947) (same holding); *see generally* C. McCormick, Evidence § 270 at 652–53 (2d ed. 1972). To submit a proffered admission by silence to the jury when there is insufficient foundational evidence to support reasonable in-

ferences that the accused heard, understood, and acquiesced in the accusatory statement would expose the jurors to testimony that they legally could not consider but that might seem, nevertheless, to be extremely prejudicial to the defendant.

██ We find that Hellerud's testimony about Rezabek's statement was improperly admitted as an admission by silence against Floyd Moore. It is beyond doubt that the evidence introduced as a foundation for admitting the testimony against Floyd Moore was wholly insufficient to support any finding that Moore heard and understood Rezabek's statement. Hellerud testified that he and Rezabek were engaging each other in direct conversation when Rezabeck made the statement. The statement was not made in a conversation that included Rezabek and all of the others who were "around." Although Hellerud testified that Floyd Moore was in the group that was "around," he gave no testimony whatsoever concerning such matters as how close Floyd Moore was to Rezabek, whether there was noise at the time, and whether Moore appeared to be listening. In the absence of some type of showing along these lines, a decision to submit or consider the supposed admission by silence would necessarily be based on pure conjecture as to the existence of the required predicative forces.[4]

The Government argues, nevertheless, as it did in the trial court, that Rezabek's statement was properly admissible against Floyd Moore also as the declaration of a co-conspirator and that consequently, even if the trial judge did admit the statement for the wrong reason, his decision as to admissibility was not error. We hold that the statement was also inadmissible as a co-conspirator's declaration.

---

4. Since we have concluded that the foundational evidence was insufficient to support a finding that Floyd Moore heard and understood Rezabek's statement, we need not consider whether Rezabek's statement, which as Hellerud repeated it for the third time, became "we will have to quit" was sufficiently accusa-

tory of Floyd Moore to justify its conditional submission to the jury as an admission by silence. Likewise, we need not decide whether Hellerud's testimony that no one "in the crowd" responded to Rezabek's statement could reasonably support an inference that Floyd Moore acquiesced in its truth.

■ The declaration of a defendant's co-conspirator is admissible against the defendant if the declaration was made during the course and in the furtherance of the conspiracy, Fed.R.Ev. 801(d)(2)(E); *Anderson v. United States,* 417 U.S. 211, 218, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), and if there is substantial independent evidence that the conspiracy existed. *United States v. Ellsworth,* 481 F.2d 864, 870–71 (9th Cir.), *cert. denied,* 414 U.S. 1041, 94 S.Ct. 544, 38 L.Ed.2d 332 (1973); *United States v. Spanos,* 462 F.2d 1012 (9th Cir. 1972); *Carbo v. United States,* 314 F.2d 718, 735–38 (9th Cir. 1963).

■ We can suggest no reasonable interpretation of Rezabek's statement, or the facts surrounding its making, that reasonably could lead us to believe that the statement was somehow "in furtherance of" the conspiracy.[5] There is nothing to support a conclusion that Rezabek, by making the statement, was seeking to induce Hellerud to deal with the conspirators or in any other way to cooperate or assist in achieving the conspirators' common objectives. *Cf. United States v. Knippenberg,* 502 F.2d 1056, 1061 (7th Cir. 1974); *Salazar v. United States,* 405 F.2d 74 (9th Cir. 1968). Rather, the statement was, at best, nothing more than Rezabek's casual admission of culpability to someone he had individually decided to trust.

The Government's other evidence against Floyd Moore may be summarized

as follows. Heckler testified that Floyd once accompanied his brother, Lee, as Lee removed a quantity of stolen hand tools from the Serv-Mart. Heckler also testified that he once saw Floyd in the garage of Lee's residence and that Floyd appeared to be peeling Government labels from the type of boxes in which Government tools are shipped. Hellerud testified that Floyd often sold Government tools at the Swap Meet, and an FBI agent testified that he had purchased a Government tool from Floyd Moore at the Swap Meet.

In the light of this other evidence, which does not appear, when carefully analyzed, to have been strong, we are not persuaded with fair assurance, that the trial judge's erroneous decision to permit the jury to consider Rezabek's statement against Floyd Moore was harmless. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Glasser v. United States,* 315 U.S. 60, 67, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The Government's other proof that Floyd Moore acted with knowledge of the stolen nature of the property, as well as with criminal intent, was particularly weak, consisting only of the inferences that could be drawn from Moore's essentially ambiguous acts. Since the admission by silence was offered to show knowledge and intent, the jurors may have relied heavily upon it, in the absence of other strong evidence, in reaching their verdict. We

---

5. One commentator has concluded that a co-conspirator's statement made "during the course" of a conspiracy ". . . may be admitted into evidence without much regard to whether it in fact furthered the conspiracy." C. McCormick, Evidence § 267 at 645 (2d ed. 1972). And some proposed codifications of the rules of evidence have eliminated the "in furtherance of" requirement altogether. *See, e. g.,* Model Code of Evidence Rule 508(b) (1942). Nevertheless, Congress has expressly retained both the "in furtherance of" and "during the course of" requirements in the new Federal Rules of Evidence. Fed.R.Ev. 801(d)(2)(E). Also, the Supreme Court continues to include the "in furtherance of" requirement in its statements of the co-conspirator's rule. *See, e. g., Anderson v. United States,* 417 U.S. 211, 218, 94 S.Ct. 2253, 41 L.Ed.2d 20

(1974); *Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). We have no doubt that in the federal courts, the "in furtherance of" requirement remains viable, and we believe that this is as it should be. "The agency theory of conspiracy is at best a fiction and ought not to serve as a basis for admissibility beyond that already established." Advisory Committee's Note to *Proposed* Fed. R.Ev. 801(d)(2)(E). *See generally, Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920, 984–86 (1959).

*Salazar v. United States,* 405 F.2d 74 (9th Cir. 1968) is not to the contrary. There we specifically found that the co-conspirator's declaration could reasonably be interpreted as having been made "in furtherance of" the conspiracy.

reverse Floyd Moore's conviction and remand his case for another trial.

Floyd Moore makes several other contentions, one of which is that the Reginato affidavit was insufficient to establish probable cause for the search of Lee Moore's residence. We reject this contention for the reasons set forth in our discussion of Lee Moore's appeal. Otherwise, since we already have concluded that Floyd Moore's conviction must be reversed, we need not reach his remaining contentions.

### III.   *Pannekoek's Appeal*

Over Pannekoek's objection, the district judge admitted into evidence the testimony of two Government witnesses, Jordan and Williams, who told of Pannekoek's alleged participation in a prior, similar conspiracy to steal Government hand tools from a different Naval Serv-Mart, located at Point Loma, California. At an earlier trial, Pannekoek had been acquitted by a jury on a conspiracy indictment based upon his alleged participation in the Point Loma thefts.

Pannekoek's first argument here is that the Point Loma thefts and the North Island thefts were not the acts of different conspiracies but were, instead, only different objects of the same conspiratorial agreement. Pannekoek contends, consequently, that since he already had been tried and acquitted on a conspiracy indictment based on the Point Loma thefts, trial on the instant indictment, charging the North Island thefts, would subject him twice to jeopardy for the same conspiracy, a single criminal offense.

■ It is well-established that the Government may not prosecute for several conspiracies when, in truth, there was only one. *United States v. Kissel,* 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910); *United States v. Palermo,* 410 F.2d 468, 470–71 (7th Cir. 1969).

But the evidence does not support Pannekoek's view that there existed only one, continuous conspiracy encompassing both the Point Loma and North Island thefts. Consequently, Pannekoek's double jeopardy claim must fail. *See United States v. Westover,* 511 F.2d 1154, 1156 (9th Cir. 1975); *Sanchez v. United States,* 341 F.2d 225 (9th Cir.), *cert. denied,* 382 U.S. 856, 86 S.Ct. 109, 15 L.Ed.2d 94 (1965); *Arnold v. United States,* 336 F.2d 347 (9th Cir. 1964), *cert. denied,* 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965).

■ As to the Point Loma thefts, Pannekoek allegedly had agreed with Williams, an employee of the Point Loma Serv-Mart, that Williams would steal Government hand tools from the Point Loma facility and deliver them to Pannekoek for sale at the Swap Meet. During at least part of the time while Pannekoek allegedly was receiving stolen goods from Williams, he also was receiving stolen tools through Lee Moore and Heckler from the North Island Serv-Mart. There is no proof, however, that the alleged Williams-Pannekoek conspiracy and the Heckler-Lee Moore-Floyd Moore-Rezabek-Pannekoek conspiracy shared any common elements other than Pannekoek as a common receiver, or "fence," for stolen goods. That fact, standing alone, is insufficient to establish the existence of a single overall conspiracy. *Kotteakos v. United States,* 328 U.S. 750, 755, 773, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Pannekoek next argues that if the Point Loma and North Island conspiracies were factually distinct, as we believe they were, the trial judge erred in rejecting Pannekoek's proposed jury instruction based on the principal holding of *Kotteakos v. United States, supra.*[6] This argument wholly misses the mark. The *Kotteakos* instruction is appropriate when, either by reason of the indictment or the proof, multiple conspiracies are at

---

**6.** The defendants requested instructions similar to those presented in 1 E. Devitt & C.

Blackmar, Federal Jury Practice and Procedure §§ 29.14–29.15 (1970).

issue in the same trial. In the instant prosecution, only one conspiracy was at issue, that involving the North Island thefts. Rather than an inappropriate *Kotteakos* instruction, the trial judge correctly informed the jury that "[t]he defendants and each of them are not on trial for any act or conduct not alleged in the indictment," and the indictment alleged only acts and conduct related to the North Island thefts.

■ The Williams and Jordan testimony concerning Pannekoek's prior similar acts was admissible under prior decisions of our court to show the knowledge and intent with which Pannekoek acted during his participation in the North Island conspiracy. *United States v. Nunez*, 483 F.2d 453, 455–56 (9th Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483 (1973); *United States v. Castro*, 476 F.2d 750, 753–55 (9th Cir. 1973); *see* Fed.R.Ev. 404(b). The trial judge carefully limited the jury's use of the testimony to that purpose. In a series of instructions that the judge identified as specifically applicable to Pannekoek, the judge instructed the jury that testimony that the accused had committed similar acts in the past was no evidence whatsoever that he had committed the acts charged in the indictment, that the testimony concerning prior similar acts could not be considered unless the jury first found, from independent evidence, that the accused had acted as charged in the indictment, and that, even then, the evidence could be considered only for the purpose of determining whether Pannekoek acted with the requisite criminal intent.

Pannekoek claims, nevertheless, that the Williams and Jordan testimony should not have been admitted because its potential for unfair prejudice substantially outweighed its probative value. *See* Fed.R.Ev. 403. We cannot say, however, that the trial judge abused his discretion in drawing the balance in favor of admissibility. There is little doubt that the testimony had probative value.

It was a substantial part of the Government's proof that Pannekoek acted with knowledge and intent. Furthermore, the judge's careful limiting instructions undoubtedly minimized, if they did not eliminate, any unfair prejudice that might have accrued.

■ Pannekoek next argues that the judge erred in rejecting a proffered jury instruction stating, in specific language, that Pannekoek could not be found guilty on the basis of the similar acts about which Williams testified. In reviewing the correctness of jury instructions, we are required to consider the instructions as a whole, *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States v. Alvarez*, 469 F.2d 1065, 1067 (9th Cir. 1972), and we have no doubt that the portions of the instructions that we have heretofore discussed amply communicated to the jury the substance of the specific instruction that Pannekoek requested.

■ Finally, we reject Pannekoek's contention that the evidence against him was insufficient to support his conviction. In doing so, we view the evidence, as we must, in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942). The Government introduced evidence that Pannekoek had sold substantial quantities of Government hand tools at the Paramount Swap Meet. Hellerud testified that Pannekoek told him "about his tools from Lee Moore," and that Pannekoek further had stated that "he couldn't make any money on legitimate stuff." The Government introduced records of numerous telephone toll charges for calls between Pannekoek and Lee Moore during the course of the North Island conspiracy. Williams testified that Pannekoek had told him that he was acquiring tools from Lee Moore and Heckler, and finally, Williams and Jordan testified about Pannekoek's similar acts. Once a conspiracy has been shown to exist, only slight evidence is required to connect a

defendant with it. *E. g., United States v. Westover,* 511 F.2d 1154, 1157 (9th Cir. 1975). The prosecution's evidence against Pannekoek was adequate.

Pannekoek's conviction is affirmed.

### IV. *Conclusion*

Recapitulating, our dispositions of these appeals are as follows:

*United States v. Emslie Leander Moore,* No. 74–2835, affirmed on both counts.

*United States v. Pieter Pannekoek,* No. 74–2268, affirmed.

*United States v. Floyd Moore,* No. 74–2150, reversed and remanded.

CHAMBERS, Circuit Judge (concurring and dissenting):

I concur in the majority opinion except as to the reversal of Floyd Moore's conviction. I believe that the district court's decision not to rule that the Rezabek statement was inadmissible against Floyd as a matter of law, if incorrect, was harmless error. Floyd Moore and Rezabek were tried together. Initially, the district court concluded that the statement was admissible against Rezabek but not Floyd, and gave a limiting instruction to that effect. Later, after the government had rested, the court changed its ruling and determined that there was sufficient evidence to send to the jury the question of whether Floyd's failure to respond to the statement could be treated as an adopted admission.

Because the statement was plainly admissible against co-defendant Rezabek, the jury would have heard it in any event. Thus, the majority's argument comes down to the proposition that reversal is compelled because of the prejudice possibly created by telling the jury that it was permissible for them to find that Floyd adopted the statement as his own. In view of all the other evidence linking Floyd to the conspiracy, I cannot conclude that the absence of this instruction would have changed the outcome.