Argued and submitted June 20, resubmitted en banc November 6, 2007,
reversed and remanded January 23, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MARK STEWART CLARK, JR.,
aka Mark S. Clark,
aka Mark Stuart Clark,
*Defendant-Appellant.*

Lane County Circuit Court
200402424; A127798

175 P3d 1006

James N. Varner argued the cause and filed the brief for appellant.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

SCHUMAN, J.

Rosenblum, J., dissenting.

**SCHUMAN, J.**

Defendant appeals a judgment of conviction for murder. ORS 163.115. On appeal, he argues that the trial court erred in admitting a statement made by the victim to one of her friends while defendant was present. We agree with defendant that the trial court erred in admitting the victim's statement as an adopted admission under OEC 801(4)(b)(B). We therefore reverse and remand.

On the night of the victim's death, she and defendant, her former boyfriend, were both at the Grove Tavern in Cottage Grove, although they were not there together. Defendant was upset about their recent breakup and the fact that, throughout the evening, the victim made loud, insulting comments about him. Defendant left the Grove Tavern around 2:15 a.m., and the victim left approximately 15 minutes later.

At approximately 2:50 a.m. that morning, police officers responded to a call reporting an intoxicated person in the lobby of the Cottage Grove Hotel. At the hotel, officers discovered the victim's body lying on the second floor near the elevator. While waiting for the paramedics to arrive, officers received a report of a disturbance in a parking lot near the hotel. Officer Smith went to investigate and discovered defendant with blood spattered on his jacket and soaking the lower legs of his jeans and boots. Defendant "started calling out—he said he hurt her real bad. He said he'd done something real bad." Defendant told Smith that he wanted Smith to kill him and that he had "hurt her bad." Smith placed defendant in a patrol car and drove defendant to the police station. There, defendant continued saying that he had "hurt her bad" and asking Smith to kill him because he did not deserve to live. Defendant appeared to be intoxicated at the time, but was only moderately impaired.

Detective Shepherd read defendant his *Miranda* rights and interviewed him a few hours later. During the interview, defendant stated that he left the Grove Tavern alone that night, but he encountered the victim a few blocks away from the bar and walked her to the Cottage Grove Hotel, where she lived. According to defendant, he planned on saying goodbye to her at the door to the hotel and walking

home. As she went inside, the victim said something to him that he did not understand, and "next thing I know she's all bloody on the ground." He said that he did not know why he began beating her, and while doing it, he "kept screaming to myself, 'stop.' I just wanted to stop." Defendant took an Intoxilyzer test during the interview and registered a blood alcohol content of .10 percent.

The victim was pronounced dead at the hospital of "blunt force head injuries complicated by the compression of the neck fracturing the bones and the cartilage in the neck."

At trial, defendant advanced the theory that he had committed manslaughter rather than murder because he did not commit the homicide intentionally; under ORS 163.115(1)(a), a criminal homicide constitutes murder "[w]hen it is committed intentionally," unless an affirmative defense applies, and a criminal homicide constitutes manslaughter in the first degree when "[i]t is committed recklessly under circumstances manifesting extreme indifference to the value of human life." ORS 163.118.

One of the witnesses who testified for the state on the question of defendant's intent was Pennington. She testified that, a few nights before the victim was killed, she and the victim were talking together at the Grove Tavern. Defendant was also there, and although he was not there with the victim, he was sitting "a seat or two away" from her. No music was playing, and the bar was not very noisy. The prosecutor asked Pennington, "At some point were they sitting together in [t]he Grove [Tavern] when [the victim], in front of [defendant,] made a comment about what he might do to her?" Defendant objected on hearsay grounds, and a hearing was held outside the presence of the jury. At that hearing, in response to questioning by the prosecutor, Pennington testified:

"A: She was telling me about a night that—just a few nights before that, that he was, um—laying outside her apartment door with his head against the door talking about, um—that he wanted to be with her. If—if he couldn't have her then nobody else was going to. He was going to kill her.

"Q: All right.

"A: And [she] told me that she believed that he was going to kill her. And I told her that if you believe that, then go to the police. But I didn't really—

"Q: All this was said with him right there?

"A: Yeah."

Pennington also testified that defendant was "probably from me to the judge away,"[1] and that the victim

"was loud enough to hear we had a conversation. She wasn't afraid. In fact, I had said something to her: He's sitting right there * * *. She said: I don't care. He can hear. He knows what he did."

The prosecutor then offered the statement as an adopted admission. Defense counsel objected:

"[DEFENSE COUNSEL]: There's no evidence that he heard it.

"THE COURT: Well, there's circumstantial evidence that he heard it.

"[DEFENSE COUNSEL]: That wouldn't qualify it as an adopted admission. There has to be something overt.

"THE COURT: No.

"[DEFENSE COUNSEL]: I mean, just the fact that he may have heard it doesn't make it an adopted admission.

"THE COURT: That's not true.

"[DEFENSE COUNSEL]: Well, there would have to be some evidence that he heard it. How could it be an adopted admission otherwise?

"THE COURT: Well, I think there is evidence that he heard it."

The court overruled defendant's objection, finding that the victim's statement was an adopted admission.

---

[1] The judge noted that, from where he was sitting, he could reach out and touch Pennington: "She stuck her hand out towards me, I stuck my hand out towards her, and we can touch fingertips."

Defense counsel then requested, and was granted, an opportunity to continue to question Pennington outside the presence of the jury, "in aid of objection." He asked her:

"[DEFENSE COUNSEL]: Okay, so is the statement that * * * [the victim] said that [defendant] made the comments that if he couldn't have her then no one else could either. And that if she did not take him back, he was going to kill her. Are you saying that was done in front of [defendant]?

"[PENNINGTON]: He was—yeah, like I said, from me to the judge. He was sitting at the bar and he was sitting there staring off to the front of the bar just like this and didn't move. I kept looking over at him and he didn't move. He just sat there.

"[DEFENSE COUNSEL]: Didn't move at all?

"[PENNINGTON]: And there was one point, I remember, the time I was there, she actually scooted over—a seat or two and he scooted over.

"[DEFENSE COUNSEL]: So they sat next to each other?

"[PENNINGTON]: No, not next to each other. Not like seat by seat. It was a couple seats away. But, like I said, that bar wasn't very big."

Defense counsel renewed his objection, arguing that an adopted admission is "a statement of which the party has manifested the party's adoption or belief. There's no overt manifestation. She can't even testify that he heard it." The court responded, "The classic adopted admission is an adoption by silence," and overruled the objection.

Pennington then testified before the jury and related the incident at the Grove Tavern, including her rendition of the victim's statement that defendant had threatened to kill the victim. Pennington testified that, in response to the victim's statement, defendant "didn't do anything. He just— stared off into the wall."

When the trial resumed the next week, defendant moved for a mistrial on the ground that Pennington's statement was improperly admitted under *State v. Carlson*, 311

Or 201, 207, 808 P2d 1002 (1991). The trial court denied that motion. Defendant was ultimately convicted of murder.

On appeal, defendant argues, in a single assignment of error, that the trial court erred in admitting Pennington's testimony as to the victim's statements and in denying his motion for a mistrial after that evidence was admitted. We decline to consider the latter challenge because it was not preserved for our review. *State v. Walton*, 311 Or 223, 248, 809 P2d 81 (1991) (to preserve claim of error, a motion for a mistrial must be timely, that is, "made when the allegedly objectionable statements were made"). For the reasons that follow, however, we conclude that the trial court erred in admitting Pennington's testimony as to the victim's statements.

■     Because there is evidence in the record that defendant heard Pennington's statement, we are bound by the trial court's finding to that effect. *State v. Johnson*, 335 Or 511, 523, 73 P3d 282 (2003). That fact alone, however, is not sufficient to support the conclusion that he adopted it. Under OEC 801(4)(b)(B), if a party "manifests * * *. adoption or belief in" the truth of a statement made by another person, the statement is admissible if offered against the adopting party. The proponent of the statement has the burden of establishing by a preponderance of the evidence that the hearer adopted the statement. *Carlson*, 311 Or at 209.

In *Carlson*, 311 Or at 207, the Supreme Court explained,

> "A party *adopts* the proffered statement of another person when that party's words or conduct indicate that [he or she] 'intended' to adopt the statement. A party manifests a *belief* in the truth of another's statement when the party intends to embrace the truth of the statement, *i.e.*, intends to agree with or approve the contents of the statement. * * * A mere listening presence does not indicate that a party has manifested an adoption of or a belief in the truth of another person's statement."

(Citations and internal quotation marks omitted; emphases and brackets in original.) The Supreme Court has also stated that "[a] party may adopt a statement either expressly, impliedly, by conduct *or, in a civil case, by silence*." *State v.*

*Severson*, 298 Or 652, 657, 696 P2d 521 (1985) (emphasis added), *cited with approval in Carlson*, 311 Or at 207. Relying on that language, defendant argues that silence, as opposed to verbal or nonverbal conduct, can never be sufficient to give rise to an adopted admission in a criminal prosecution.

Defendant's contention is not clearly incorrect. The Alabama Supreme Court, for example, has adopted that rule. In *Ex parte Marek*, 556 So 2d 375, 381 (Ala 1989), the court explained that, because nonresponse to an accusatory statement may flow from a variety of causes, it is not reasonable to draw *any* conclusions from it. Nor does anything in Oregon law militate against adopting a similar rule here. As defendant contends, the negative implication from the statement in *Severson*—"[a] party may adopt a statement either expressly, impliedly, by conduct or, in a civil case, by silence"—although not conclusive as a matter of pure logic, is that silence is never enough to constitute an adopted admission in a criminal case. Further, the legislature's commentary reveals that the drafters of the evidence code believed that finding an adopted admission by silence would be problematic in a criminal case:

> "An admission may be made by adopting or acquiescing in the statement of another. * * * Adoption or acquiescence may be manifested in any appropriate manner. The greatest issues surround silence, where the theory is that the person would have protested an untrue statement. This calls for an evaluation of probable human behavior under the circumstances. In civil cases the results have been generally satisfactory. *In criminal cases, troublesome questions are raised. The inference involved is fairly weak to begin with. Silence may be motivated by advice of counsel or a realization that 'anything you say may be used against you.'* Unusual opportunity is afforded to manufacture evidence. Encroachment upon the privilege against self-incrimination seems inescapable. Not surprisingly, in *Doyle v. Ohio*, 426 US 610, 96 S Ct 2240, 49 L Ed 2d 91 (1976) and *United States v. Hale*, 422 US 171, 95 S Ct 2133, 45 L Ed 2d 99 (1975), the United States Supreme Court held that evidence of silence during police interrogation is inadmissible at the defendant's subsequent trial for the purpose of impeaching the defendant's credibility. Such evidence was

declared to be insolubly ambiguous, fundamentally unfair and possessed of an intolerably prejudicial impact. The Legislative Assembly agrees. This subparagraph should not be construed to allow the admission, for any purpose in a criminal case, of evidence of silence during police interrogation after the defendant has been informed of the right to remain silent as provided in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). In light of the *Doyle* and *Hale* decisions, Rule 801 contains no special provisions concerning failure to deny in criminal cases."[2]

Legislative Commentary to OEC 801(4)(b)(B), *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 801.03, 674 (5th ed 2007) (emphasis added). Thus, although the legislature did not foreclose the possibility of a statement being adopted by silence—unless the silence occurred during a police interrogation after *Miranda* warnings—the legislature expressed concern about allowing adoption by silence in a criminal case because "the inference is fairly weak."

In any event, even if silence in the face of an accusatory statement could, in some situations, amount to an adoption of that statement, the silence in this case did not. The Oregon Supreme Court applied OEC 801(4)(b)(B) to nonverbal conduct in *Carlson*. In that case, police officers questioned the defendant about needle marks on his arms. When the defendant replied that the marks were injuries that he had received from working on a car, his wife yelled, "You liar, you got them from shooting up in the bedroom with all your stupid friends." In response, the defendant "hung his head and shook his head back and forth." 311 Or at 203. The Supreme Court concluded that the "defendant's nonverbal reaction is so ambiguous that it cannot reasonably be deemed sufficient to establish that any particular interpretation, consistent with the trial judge's ruling, is more probably correct." *Id.* at 214.

Although *Carlson* dealt with nonverbal conduct, rather than silence, the *Carlson* court's interpretation of OEC 801(4)(b)(B) guides our analysis in this case. In *Carlson*, the court stated that:

---

[2] The legislative commentary to OEC 801(4)(b)(B) is nearly identical to the Notes of the Advisory Committee on FRE 801(d)(2)(B).

"[w]hen it is claimed * * * that a party-litigant has manifested an adoption or a belief by nonverbal conduct and the conduct is susceptible of more than one interpretation, * * * the court must examine the totality of the circumstances surrounding the hearsay declaration and the party's nonverbal behavior to determine whether the party intended to adopt, agree with or approve the contents of the declaration."

311 Or at 208.

■ The totality of the circumstances in this case do not establish that defendant's silence was anything more than a "mere listening presence." *Carlson*, 311 Or at 207. In response to the victim's statement, defendant "didn't do anything. He just—stared off into the wall." The only evidence to support the conclusion that defendant adopted the statement is that he heard the statement, the statement was important, and it was accusatory. But, under those facts, there are many reasons why defendant may have decided not to respond. Most obviously, he may have wanted to avoid arguing with the victim, especially in a bar, or he may have believed that it would be inappropriate to intrude into the conversation of which he was not part.[3] Given the many reasons why defendant may have chosen not to intrude into the conversation between the victim and her friend, we conclude that, as in *Carlson*, 311 Or at 214, "defendant's * * * reaction is so ambiguous that it cannot reasonably be deemed sufficient to establish that any particular interpretation * * * is more probably correct. We hold, therefore, that there was insufficient evidence to support a finding by a preponderance of the evidence that defendant intended to adopt, agree with or approve" the statement the victim made to Pennington.

Another fact in the present case undermines the conclusion that defendant adopted the accusatory statement:

---

[3] Testimony from another witness, Holcomb, admitted after Pennington's testimony, demonstrates that it would not have been out of character for defendant to maintain silence in response to a negative statement that the victim made about him. Holcomb testified that when the victim was at a bar and defendant would walk by, she would often make loud, insulting comments meant to embarrass him. In response to these insults, defendant normally "would try to take himself out of the situation, but he was very quiet. He didn't—from what I saw, he didn't make a disturbance."

defendant was a bystander, not a participant, in the conversation during which the statement was made. In interpreting FRE 801(d)(2)(B)—which the *Severson* court recognized as an analog to OEC 801(4)(b)(B)—no federal court, as far as our research has been able to discover, has held that a defendant adopted a statement made in the defendant's presence where the defendant was not an *active participant in the conversation*. In *U.S. v. Ward*, 377 F3d 671, 676 (7th Cir 2004), *cert den*, ___ US ___ , 127 S Ct 56 (2006), the Seventh Circuit upheld a finding that a defendant had adopted a statement where the statement was made near the defendant in an apartment and the defendant's subsequent verbal response indicated that he had heard the earlier statement. The court noted that the statement had been made during a conversation in which the defendant was an active participant. Similarly, the Eighth Circuit upheld a finding that a defendant had adopted a statement made by the defendant's co-conspirator to the defendant's mother because the defendant "actively participated in the conversation and did not contradict or deny [his co-conspirator's] statements." *U.S. v. Kehoe*, 310 F3d 579, 591 (8th Cir 2002), *cert den*, 538 US 1048 (2003).

In contrast, the Ninth Circuit excluded an allegedly adopted statement where the only evidence that the defendant had heard the statement was that he was "around" when the statement was made, and there was no evidence about how close the defendant had been to the declarant of the statement or how noisy the area was where the statement was made. *United States v. Moore*, 522 F2d 1068, 1076 (9th Cir 1975), *cert den*, 423 US 1049 (1976). The Eighth Circuit also excluded an allegedly adopted statement in *Arpan v. United States*, 260 F2d 649 (8th Cir 1958). In *Arpan*, the defendant's father told a coroner shortly after the defendant's wife's death that the defendant had said that he had killed her. The discussion between the defendant's father and the coroner occurred in the defendant's kitchen while the defendant, who was depressed and withdrawn, sat in the kitchen near his mother. *Id.* at 656-57. The court stated,

"Usually, situations of implied or adoptive admission in criminal cases have involved some tie on the part of the accused to the setting or the events of the making of the

statement, so that he would naturally be prompted to engage in denial or reply. In [a] patent and extreme example, a man walking on the street and passing two strangers carrying on a private conversation about him could hardly legally be regarded as having a responsibility to stop them and make denial of some incriminating statement asserted against him, in order to prevent it from subsequently being treated as an adoptive admission by him.

"* * * * *

"We should have difficulty persuading ourselves that [the circumstances in this case] presented such a situation of naturally expectable responsiveness to anything which might fortuitously have drifted to appellant's hearing, of the conversation between the coroner and his father, as to entitle his failure to be prompted to interjection or denial to be fairly regarded as an adoptive assent or admission by him."

*Id.*

For all of the reasons discussed above, including the fact that defendant was not a participant in the conversation at the bar and did not exhibit any behavior manifesting an adoption or belief in the victim's statement, we conclude that there is inadequate evidence that he adopted the accusatory statement. The trial court erred in ruling to the contrary.

■       The state also argues that admission of the victim's statement to Pennington was harmless, because evidence of similar threats was also admitted. However, we conclude that, given the importance of the statement made to Pennington and the differences between that statement and the other threats on which the state relies, admitting the statement was not harmless.

■       Under the Oregon Constitution, error is harmless if there is little likelihood that the particular error affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Pennington's testimony was offered to demonstrate that defendant *intentionally* killed the victim. According to the state, the testimony of other witnesses established intent.

First, the state relies on the testimony of Ames. Ames testified that defendant had told him that defendant

was so frustrated that "he felt he could kill someone." However, Ames testified that he did not believe that defendant was referring to the victim, but, rather, stating that he could kill someone in general.

The state also presented evidence that, at least two months before trial, defendant had asked another acquaintance, Newton, whether the victim was using drugs and told Newton that he would kill her if she was. Newton told defendant that the victim was not using drugs. After defendant killed the victim, the police found a letter on him that was addressed to the victim. In that letter, defendant stated, "Why you did what you did to me and then lied to me about it, I don't even know. I don't know if it was the drugs or booze. * * * I don't intend to say anything about your * * * drugs[.]"

Neither of these pieces of testimony is sufficient to make the erroneously admitted evidence harmless. According to Ames's testimony, defendant stated that he "*could* kill someone"; but he did not state that he *intended* to kill anyone, and he certainly did not indicate that he intended to kill the victim. The threat regarding the alleged drug use presents a closer question, but that evidence does not have the same weight as Pennington's testimony. Although defendant refers to the victim's drug use in the letter, the letter does not disclose whether he actually had knowledge that the victim had used drugs. Additionally, the threat defendant made to Newton more than two months before her death would likely not have the same weight in the minds of most jurors as the threat defendant made the week before he killed the victim. Finally, defendant's threat to kill the victim if she used drugs is much more likely to be interpreted as an idle threat than the statement that he was going to kill her if he could not have her.

We cannot say that there is little likelihood that defendant's threat to kill the victim if he could not have her had an effect on the verdict. According to defendant's testimony, on the night of the homicide, he walked the victim to her apartment and intended to leave and go home; instead, he began beating her, and he did not know why he had done it. Immediately after being arrested, defendant confessed to having hurt the victim and made no effort to cover up his

crime. Based on those facts, the victim's statement, offered through Pennington's testimony, that defendant threatened to kill her was important evidence to establish that he had committed the crime intentionally. Because none of the other evidence admitted had the same weight, we conclude that the admission of Pennington's testimony was not harmless.

Reversed and remanded.

**ROSENBLUM, J.,** dissenting.

This case is about whether the deceased victim's conversation with a friend (the witness Pennington) that was had in the presence of—and heard by—defendant, describing an incident in which defendant had threatened to kill the victim, should have been allowed into evidence at trial. Defendant killed the victim, his former girlfriend, a few nights after the conversation with Pennington. The majority concludes that the statements were hearsay and that the trial court erred in admitting them as "adopted admissions" by defendant under OEC 801(4)(b)(B). I disagree that the trial court erred and, therefore, dissent.

The circumstances of this case are unusual in several important respects: First, unlike many "adopted admissions" cases, there was no police presence whatsoever at the time the statements were made. No crime had occurred; no crime was under investigation. Second, the state's sole purpose in offering the statement in this case was to provide circumstantial evidence of defendant's intent to kill the victim. Thus, the statement was offered to prove only that defendant had said, on a prior occasion, that he would kill the victim if he could not have her as his girlfriend. That is precisely the sort of statement that cries out for a denial or clarification by the maker of the statement—if in fact it was not made or was otherwise misunderstood. This is particularly true when, as here, there was a clear opportunity for defendant to clarify his intentions, whether or not he had made the statement. Instead, defendant responded simply by staring at the wall. A few days later, the victim was dead, and the defense to the murder charge was that defendant had not acted intentionally.

As the majority notes, Oregon does not have a definitive rule prohibiting adopted admissions by silence in all criminal cases. 217 Or App at 482-83. Indeed, the legislative commentary accompanying the enactment of the Oregon Evidence Code indicates that the legislature, while being fully cognizant of the special concerns raised in criminal cases, chose *not* to adopt such a bar, except in the narrow circumstances where the silence occurs during police interrogation after *Miranda* warnings have been given:

> "Adoption or acquiescence may be manifested in any appropriate manner. The greatest issues surround silence, where the theory is that the person would have protested an untrue statement. This calls for an evaluation of probable human behavior under the circumstances. In civil cases the results have been generally satisfactory. In criminal cases, troublesome questions are raised. The inference involved is fairly weak to begin with. Silence may be motivated by advice of counsel or a realization that 'anything you say may be used against you.' Unusual opportunity is afforded to manufacture evidence. Encroachment upon the privilege against self-inclimination seems inescapable. Not surprisingly, in *Doyle v. Ohio*, 426 US 610, 96 S Ct 2240, 49 L Ed 2d 91 (1976) and *United States v. Hale*, 422 US 171, 95 S Ct 2133, 45 L Ed 2d 99 (1975), the United States Supreme Court held that evidence of silence during police interrogation is inadmissible at the defendant's subsequent trial for the purpose of impeaching the defendant's credibility. Such evidence was declared to be insolubly ambiguous, fundamentally unfair and possessed of an intolerably prejudicial impact. The Legislative Assembly agrees. This subparagraph should not be construed to allow the admission, for any purpose in a criminal case, of evidence of silence during police interrogation after the defendant has been informed of the right to remain silent as provided in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). In light of the *Doyle* and *Hale* decisions, Rule 801 contains no special provisions concerning failure to deny in criminal cases."

Legislative Commentary to OEC 801(4)(b)(B), *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 801.03, 674 (5th ed 2007). The legislature thus contemplated that a criminal defendant's silence *could* constitute an adopted admission as long as the circumstances did not involve police interrogation

after the administration of *Miranda* warnings. *See also* Kirkpatrick, *Oregon Evidence* § 801.03 at 685 ("Silence in the face of accusations by persons other than law enforcement officers may be admissible against the defendant in a criminal case.").

In my view, this case presents an opportunity to clarify that a criminal defendant's silence *may* manifest an adoption where, as here, defendant heard and understood the accusatory statement, it was the sort of statement that, under the circumstances, a reasonable person would deny, disavow, or, at a minimum, attempt to clarify, and where the statement did not arise during police interrogation after *Miranda* warnings had been given.

Defendant argues that this approach is precluded in Oregon, relying on the court's observation in *State v. Severson*, 298 Or 652, 657, 696 P2d 521 (1985), and quoted in *State v. Carlson*, 311 Or 201, 207, 808 P2d 1002 (1991), that "[a] party may adopt a statement either expressly, impliedly, by conduct *or, in a civil case, by silence.* Commentary to Oregon Evidence Code 148-49 (1981)." (Emphasis added.) The majority is, at least to some extent, persuaded by that argument. *See* 217 Or App at 482 (positing that "[d]efendant's contention is not clearly incorrect" and noting that the Alabama Supreme Court has adopted it). Yet, as the majority recognizes, it does not necessarily follow from the statement made by the court in *Severson* that the opposite is also true—that is, that silence can never be sufficient in a criminal case. Such a reading of *Severson* is particularly doubtful in light of the *Severson* court's citation to the legislative commentary, which, as demonstrated above, evidences the legislature's intention to exclude the use of silence in criminal cases only in certain circumstances. *See* Kirkpatrick, *Oregon Evidence* § 801.03 at 685 ("As the Commentary indicates, adoption by silence should rarely be found in a criminal case *where the defendant has failed to respond to an accusation made by or in the presence of a law enforcement officer.*" (Emphasis added.)).

*Carlson*, the leading Oregon case on the subject of adopted admissions, also does not compel the conclusion that silence is automatically an insufficient basis upon which to

find that a statement has been adopted by a criminal defendant. Although the court in *Carlson* explained that "[a] mere listening presence does not indicate that a party has manifested an adoption of or a belief in the truth of another person's statement," 311 Or at 207, the import of the court's comment is simply that silence does not *automatically* satisfy the requirement of the rule for adopted admissions; it does not foreclose the possibility that, given the totality of the circumstances under which the statement was made, a criminal defendant's silence in light of those circumstances may nevertheless demonstrate, rather than a "mere listening presence," the defendant's intention to adopt the statement. Indeed, the federal treatise cited by the *Carlson* court for the proposition that a "listening presence" alone is insufficient says as much:

> "[D]eciding that a party was present and that he heard a statement uttered by another represents only one step in a larger inquiry. It should not by itself satisfy Rule 801(d)(2)(B).[1] A mere listening presence does not indicate that a party has adopted or manifested his belief in everything that is said, and even active participation in a conversation does not so indicate. The philosophy of the adversary system does not, in such minimal circumstances, suggest that the absence of the usual safeguards of oath, cross-examination, and demeanor evidence should be excused. In addition to a listening presence, it should be shown that a party has replied or otherwise spoken or acted in a manner which shows his adoption or belief in the statement or, *if the party has stood silent, that the circumstances indicate that silence manifests belief or adoption.*"

David W. Louisell & Christopher B. Mueller, 4 *Federal Evidence* § 424, 265-66 (1980) (footnote omitted; emphasis added);[2] *see also* Kirkpatrick, *Oregon Evidence* § 801.03 at

---

[1] FRCP 801(d)(2)(B) is essentially identical to OEC 801(4)(b)(B).

[2] The most recent edition of the treatise, authored by Mueller and Kirkpatrick, contains a similar explanation, expressing the concept as follows:

"The philosophy of the adversary system and the underlying notion of personal responsibility do not extend so far as to suggest that parties should be saddled with statements by outsiders to which they have a loose and uncertain connection. Adoption turns on whether a party replied in a way that shows agreement with something said by another person, or otherwise spoke or acted in a

683 ("Adoption by implication may be found when a party remains silent in response to a statement where a reasonable person, under the circumstances, would deny correct, or otherwise answer the statement if false.").

The treatise further explains that, when a party does or says nothing in response to a statement, the question whether the inaction or silence indicates adoption must be resolved by examining the circumstances. Louisell and Mueller, 4 *Federal Evidence* § 424 at 268. To indicate adoption, it must appear that the party heard the statement, the matter was within his or her knowledge, and, "perhaps most importantly," "the occasion and nature of the statement [were] such that the party would likely have replied if he did not mean to accept what was said." *Id.* (footnote omitted); *see also U.S. v. Kehoe*, 310 F3d 579, 591 (8th Cir 2002), *cert den*, 538 US 1048 (2003) (for an out-of-court statement to constitute an adopted admission under FRE 801(d)(2)(B), the defendant must have been present when the statement was made, have understood it, and have had an opportunity to deny it); *United States v. Moore*, 522 F2d 1068, 1075-76 (9th Cir 1975), *cert den*, 423 US 1049 (1976) ("The general rule concerning admissions by silence or acquiescence is well established. When an accusatory statement is made in the defendant's presence and hearing, and he understands and has an opportunity to deny it, the statement and his failure to deny are admissible against him."). Even if the minimum conditions are satisfied, however, the statement still should be excluded if it appears that (1) the party did not understand the statement or its significance, (2) the party was prevented from replying by "some physical or psychological force," (3) the speaker was someone whom the party would be likely to ignore, or (4) in the criminal context, the statement was made by law enforcement officers, or persons acting on their

---

manner that shows agreement less directly. If she remained silent as others spoke, this behavior too can show agreement, but *much then depends on the nature of the situation,* and inferring agreement from inaction or silence is more problematic."

Christopher B. Mueller and Laird C. Kirkpatrick, 4 *Federal Evidence* § 8:47, 386-87 (3d ed 2007) (emphasis added). Because the first edition of the treatise is the edition relied on by the Supreme Court in the *Carlson* decision, we generally cite it throughout this opinion. The same discussion, however, appears in the current edition. *See* Mueller and Kirkpatrick, 4 *Federal Evidence* § 8:47 at 386-97 (3d ed 2007).

behalf, during custodial interrogation. Louisell and Mueller, 4 *Federal Evidence* § 424 at 268-69.

The circumstances in this case satisfy the requirements for an adopted admission as outlined above. First, the trial court found—and the evidence supports—that defendant heard the victim's statements. The bar was relatively quiet that night, no music was playing, and defendant was sitting within hearing range of the victim. It is also beyond dispute that defendant had knowledge of the subject matter of the statements.

Next, the statements did not occur in response to police questioning or, indeed, even in the presence of a police officer or under other circumstances where defendant might reasonably be expected to remain silent due to concerns that "anything he said could be used against him." This is far different from the circumstances of *Carlson*, in which the statements were made in the presence of police officers as they were investigating the defendant for possible criminal behavior.[3]

Most importantly, the "occasion and nature" of the statements were such that a reply would be expected. Louisell and Mueller, 4 *Federal Evidence* § 424 at 268 (among the factors to be considered in determining whether a party's silence indicates adoption, perhaps most important is whether "the occasion and nature of the statement were such

---

[3] Interestingly, Mueller and Kirkpatrick suggest that, under FRE 801(d)(2)(B), even the presence of police officers may not be enough to defeat the finding that a suggestive statement was adopted by silence:

"Silence by the defendant within earshot of officials in the face of accusations or suggestive questions by friends or cohorts is probably admissible if the situation suggests adoption.

"If the defendant is *not* in custody, the presence of law enforcement officers does not block an inference of adoption or raise constitutional concerns. The question whether silence indicates adoption depends entirely on the circumstances, and particularly on the question whether the accused (a reasonable person in the position of the accused) would likely have replied in some more definitive way than the defendant did when the statement was made, so that his silence or equivocal response fairly indicates agreement with the points implied in the statement."

Mueller and Kirkpatrick, *Federal Evidence* § 8:48 at 402 (footnote omitted; emphasis in original).

that the party would likely have replied if he did not mean to accept what was said"). As the Second Circuit explained:

> "Where the defendant's adoption of another person's statement purportedly is manifested by *silence*, or other ambiguous conduct, courts will consider the incriminatory content of the statement in order to determine whether the defendant actually has adopted the statement by his silence. The rationale of such cases is that a person ordinarily will respond to an incriminatory or defamatory statement with a denial, or at least with some indication that he objects to the statement as untrue."

*United States v. Shulman*, 624 F2d 384, 390 (2d Cir 1980).

Here, the statements attributable to defendant were particularly inflammatory and portrayed defendant in the worst possible light—according to the victim, he said "[h]e was going to kill her" and "if he couldn't have her then nobody else was going to." Those are precisely the type of words that would be expected to draw a reply if defendant did not mean to accept that he had said them. And, defendant had ample opportunity to reflect on what the victim said and to refute the statements. That is especially true in light of the fact that he was *prompted* to respond by the victim: When Pennington pointed out that defendant was sitting close enough to hear the victim, the victim responded, "I don't care. He can hear. He knows what he did." Even so, defendant did nothing to deny or disavow that he had made such serious threats. Even after Pennington suggested to the victim that she contact the police, defendant did not respond.

Still, the majority contends that the circumstances fail to establish that defendant's silence was "anything more than a 'mere listening presence.'" 217 Or App at 484. The majority is apparently persuaded that defendant's lack of reply was explained by some psychological force or because the victim was someone whom defendant would likely ignore, *see* 217 Or App at 484 n 3 (explaining other possible reasons for defendant's lack of response and recounting the testimony of one witness that "it would not have been out of character for defendant to maintain silence in response to a negative statement that the victim made about him").[4]

---

[4] None of the other exclusions is even arguably applicable here: Nothing in the record indicates that defendant did not understand or appreciate the significance

That position is not supported by the record. As to this point, some elaboration of the facts recounted in the majority opinion is necessary. The majority relates that the victim and defendant were both at the Grove Tavern the night the conversation that is the subject of this appeal took place, and they were also both there a few nights later, the night of the victim's death. What is not readily apparent from the majority opinion, however, is that the Grove was essentially a home away from home for defendant and the victim and the "on again, off again" relationship between them largely *existed* at the Grove, a small bar where the "regulars" all knew one another. The victim worked at the Grove as a cook and bartender and lived nearby; defendant, who was out of work, often just hung out there when the victim was working; and the two socialized there all the time, both together and independently. On the night of the victim's death, for example, although they had broken up a few weeks earlier, and the victim was not working that night, both defendant and the victim were at the Grove at around 5:00 to 6:00 in the evening, and they were still there when the bar got ready to close between 2:00 and 2:30 the following morning. They also were both present in the bar on the several nights before the crime occurred.

Testimony at trial revealed that the drama of their tumultuous relationship also often played out at the Grove. Indeed, the picture that had emerged at trial by the time the court admitted the disputed testimony was one of frequent—and loud—arguing and bickering *between* defendant and the victim. (As one witness indicated, "everyone knew they weren't getting along.") Defendant was not just a passive receptor for the victim's negative comments, as the majority would have us believe. For example, Newton, who also worked at the Grove, testified that, during one of their fights, defendant called the victim names, such as "nasty fat bitch," loud enough for everyone to hear. Again, on the night before the crime, the victim was tending bar and defendant "kept pestering her." According to Newton, "he would come in and say things and it would upset her." This went on for several

---

of the statement, no physical barriers prevented defendant from responding, and, as noted, the statement was not made during custodial interrogation or even, as was the case in *Carlson*, in the presence of police.

hours, according to Newton. Ames, another frequenter of the Grove, described their arguments as "more of them saying smart comments to each other loud enough for the whole bar to hear." Rhodes, who also knew the victim and defendant from the Grove, testified that "[t]here was fighting a lot," generally about money and flirting, and "[i]f they'd start raising their voices, I'd leave." Similarly, the owner of the tavern described the arguments between them as "airing their dirty laundry" loud enough for others to hear.

For the same reasons, defendant also cannot, as the majority suggests, be characterized as a "bystander" to the conversation. 217 Or App at 485. This is not a case, in the words of Mueller and Kirkpatrick, of "saddl[ing] [defendant] with statements by outsiders to which [he has] a loose and uncertain connection." Mueller and Kirkpatrick, 4 *Federal Evidence* § 8:47 at 387. Defendant and the victim had an existing relationship. They were often at the Grove at the same time, and, whether they could be characterized as being there "together" on any particular day, it was not unusual for them to argue back and forth or to make negative comments about the other loud enough for the other to hear. At the time the statements in question were made, they were even seated very close—within a seat or two of one another—and, at some point during the evening, when the victim moved over a seat or two, defendant also moved over.[5]

In sum, while I am mindful that inferring adoption from silence in a criminal case must be approached with caution, given the totality of the circumstances of this case, I agree with the trial court that defendant's silence represented a "classic" adopted admission by silence. In other words, I would affirm the ruling of the trial court because the evidence supports that defendant heard and understood the

---

[5] In any event, the majority overplays the significance of the federal courts' reliance on the "active participant" distinction. 217 Or App at 484-86. In each of the cases the majority relies on to illustrate that proposition—*U.S. v. Ward*, 377 F3d 671 (7th Cir 2004), *cert den,* ____ US ____, 127 S Ct 56 (2006); *Kehoe*, 310 F3d at 591; *Moore*, 522 F2d at 1076; and *Arpan v. United States*, 260 F2d 649, 657 (8th Cir 1958)—the fact that the defendant was or was not an "active participant" in the conversation was significant only to the court's determination of whether the defendant had *heard and understood* the statement. In this case, however, the trial court made an explicit finding that defendant heard the statement and, as the majority concedes, that finding is supported by evidence in the record.

statement, it was of a type that a reasonable person would likely have responded to if untrue, defendant had an opportunity to deny, disavow, or explain the statement, but did not, and the statement was not made in the presence of police. None of the factors that might, nevertheless, suggest that exclusion would be appropriate, 217 Or App at 492-93 (Rosenblum, J., dissenting), is present here.

Therefore, I respectfully dissent.

Haselton, Armstrong, and Ortega, JJ., join in this dissent.